## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ELIZABETH GUENTHER : 

       Plaintiff, : 
                                  Case No. 3:07CV0147

  vs. : 
                                  District Judge Thomas M. Rose

MICHAEL J. ASTURE, :   Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration, : 

       Defendant. : 

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

      Plaintiff Elizabeth Guenther has held various jobs in fast food restaurants, gas stations and grocery stores. (Tr. 83, 107). She alleges that she became disabled on April 1, 2000, due to bipolar disorder. (Tr. 82). She consequently sought financial assistance from the Social Security Administration by applying for disability insurance benefits ["DIB"] on April 7, 2003, and for supplemental security income ["SSI"] with a protective filing date of March 13, 2003.

      After various administrative proceedings, Administrative Law Judge Melvin A. Padilla denied Plaintiff's DIB and SSI applications based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Security Act.  (Tr. 25).  The ALJ's nondisability determination and the resulting denial of

benefits later became the final decision of the Social Security Administration.  Such final

decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is

due.

This case is before the Court upon Plaintiff's Statement of Issues (Doc. #6), the

Commissioner's Memorandum in Opposition (Doc. #9), the administrative record, and

the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision or, at a minimum, a remand of this

case to the Social Security Administration to correct alleged certain errors.  The

Commissioner seeks an Order affirming the ALJ's decision.

## II.    FACTUAL BACKGROUND

At the time of the ALJ's decision, Plaintiff's age (22) placed her in the category of

a "younger individual" for purposes of resolving her DIB and SSI applications.  *See* 20

C.F.R. §§ 404.1563(c), 416.963(c).  She has a high school education.  (Tr. 23).   *See* 20

C.F.R. §§ 404.1564(b)(4), 416.964(b)(4).

Plaintiff testified during the ALJ's hearing that she is unable to hold a job due to

emotional problems.  (Tr. 398).  She believes that her problems began in around 1999 or

2000.  (Tr. 398).  She last worked for three days in September 2006 (Tr. 397), but it was a

temporary job.  (Tr. 408).  She believes that none of her jobs have lasted more than 90

days (Tr. 397), which she attributes to "the manic up and downs."  (Tr. 407).  When on a

high, "I'll have real racing thoughts and feel that the decisions I make are the correct ones

-2-

and just be real spontaneous." (Tr. 407). When low, "I realize that the choices I did make weren't the right ones," and "then I'm more depressed . . . [and] I'd rather just stay at home and not do anything." (Tr. 407).

Plaintiff estimates she gets out once or twice in an average week. (Tr. 398). Her last boyfriend moved out two weeks before the hearing. (Tr. 399). Their relationship "was real rocky" due to her "rapid ups and downs." (Tr. 410). Her appetite "varies;" "if I'm depressed and in a low state, . . . I'll eat a good amount of food . . . , but if I'm in a manic high, I'll eat once a day if that." (Tr. 399). She gained 50 pounds in the year prior to the hearing. (Tr. 399). She gets five or six hours of sleep a night, at most, and cries a "[c]ouple of times a week." (Tr. 399).

She has seen Dr. Rahman, a psychiatrist, since 2003 and was seeing him every three months as of the time of the hearing. (Tr. 400, 406-07). Prior to treating with Dr. Rahman, she saw Mary Bowman, Jamie Snyder and another doctor [inaudible on transcript, but presumably Dr. Mahajan]. (Tr. 405). Ms. Bowman evaluated Plaintiff, but referred her to Dr. Snyder, another psychiatrist, who started her on medication. (Tr. 405). Twice while treating with Dr. Snyder, in 1999 and 2002, Plaintiff was admitted as an inpatient, for "severe manic high[s]." (Tr. 405). In 2005, she had weekly therapy sessions with Josh Francis of Tipp City Professionals, but last saw him in June 2005. (Tr. 400). She believes that the counseling was helping. (Tr. 401).

Dr. Rahman prescribes Plaintiff's current medication. (Tr. 407). She began taking Wellbutrin (Tr. 402) in 2003 or 2004 when she started to treat with Dr. Rahman, and

continues to take it. (Tr. 401). The Wellbutrin "helps a lot . . . with my mood swings," but prior medications would work only for a month or two and then stop working. (Tr. 401). At the time of the hearing, she denied being in counseling or seeing any other doctor for physical problems. (Tr. 407; *see also* Tr. 400).

Plaintiff was incarcerated for six months for attempted burglary and is on parole until December 2008. (Tr. 401). That crime occurred when one of Plaintiff's friends suggested that they rob her grandmother's home, "and I thought that would be the okay thing to do . . . because I was at this real high point." (Tr. 409). Another charge for domestic violence was dropped to menacing, and she was released from probation upon completion of an anger management class. (Tr. 401). She claims to have stopped drinking alcohol and using drugs in 2002, and to have stayed off both for four years (Tr. 402), but she does smoke cigarettes. (Tr. 404). She admits to having conflicts with her parents and arguments with her sister. (Tr. 404).

Plaintiff graduated from high school in 2005 when she was 21 years old. (Tr. 406). She had trouble in school and was in a SBH ["Severe Behavioral Handicapped"] class. (Tr. 406). A career center program that she was told would take six weeks actually took her two years. (Tr. 406).

Plaintiff's testimony at the hearing was followed by that of a vocational expert, Mark Fay. (Tr. 411-12). Mr. Fay testified that Plaintiff's "light and unskilled" work experience in fast food jobs was not "past relevant work." (Tr. 411). Based on a hypothetical regarding a person with Plaintiff's characteristics and specified restrictions,

Mr. Fay testified that such an individual could perform approximately 9,000 jobs at the high exertion level, 12,000 jobs at the medium level, 6,000 jobs at the light level and 2,500 jobs at the sedentary level.  (Tr. 411-12)  Such jobs included "baker helper" (heavy) and "toy stuffer" (sedentary).  (Tr. 412).

The parties have provided detailed and informative descriptions of Plaintiff's medical and scholastic records, supported with specific citations to evidence of record. (*See* Doc. #6 at 5-14; Doc. #9 at 2-7).  In light of this, and upon the Court's consideration of the record as a whole, there is no need to expand upon the parties' well-written factual descriptions.  Still, describing a few medical source opinions will help frame further review.

Plaintiff relies on the medical records of three treating psychiatrists, claiming that their treatment notes document the continual racing thoughts and suicidal and homicidal ideation that the Plaintiff has endured in recent years.  (*See* Doc. #6 at 15).  The only formal "opinions" noted among the records of her treating physicians, however, appear in two evaluations and in an Ohio Bureau of Disability Determination ["BDD"] questionnaire prepared by Dr. Mahmood Rahman, Plaintiff's psychiatrist since 2003. (*See* Tr. 339-41, 342-57; 375-76).

In his first evaluation, dated January 25, 2005, Dr. Rahman diagnosed Plaintiff with "Bi-polar Affective Disorder, mixed," as well as "Panic Disorder."  (Tr. 340).  He cataloged a history of "a hard time concentrating in school, being disruptive at times and always lagging behind," along with "mood swings, depression, anxiety" and worry.  (Tr.

339).  He said Plaintiff described "distinct episodes" of "severe[ ] depress[ion]," with "thoughts of hopelessness and worthlessness," followed by "periods of extremely high energy," with hyperactivity, euphoria and "racing thoughts."  (Tr. 339).  He also chronicled a history of being unable to keep jobs, "very poor coping skills and poor insight and judgment," and "numerous bad relationships."  (Tr. 340).  Dr. Rahman concluded that Plaintiff's prognosis "is somewhat guarded," and that "in my opinion she probably would not be very productive unless she gets a part-time job working no more tha[n] 4 or 5 hours a day."  (Tr. 341).

Dr. Rahman's more recent evaluation, dated November 15, 2006, again cites Plaintiff's "Bipolar Affective disorder" with "mixed phenomena."  (Tr. 375).  He notes three inpatient admissions, and again comments on her academic struggles and unstable employment record.  (*Id.*).  Additionally, he remarks specifically on her lack of energy, motivation and interest, complicated by "severe panic attacks."  (*Id.*).  Deeming her ability to relate socially "considerably impaired," her ability to comprehend consistently "quite impaired in terms of cognitive testing," and also noting her "unpredictable mood swings," her "very low frustration tolerance," her inability "to withstand pressures in the context of 'normal productive work'," and her "tend[ency] to decompensation when subjected to stress," Dr. Rahman concludes that "I do not think Elizabeth can be gainfully employed."  (Tr. 375-76).

The BDD had Plaintiff examined by a clinical psychologist, Alan R. Boerger, Ph.D., in July 2003.  (Tr. 269-274).  Dr. Boerger diagnosed Plaintiff with Bipolar II

Disorder. (Tr. 273). At that time, he rated Plaintiff's ability to relate to others, including fellow workers and supervisors, as moderately to markedly impaired, as reflected in her history of relationship problems on the job. (Tr. 273). He also rated her ability to understand and follow instructions as moderately impaired; her ability to maintain attention and perform simple repetitive tasks as moderately to markedly impaired; and her ability to withstand stress and pressures associated with day-to-day work activity as moderately to markedly impaired, due to her bipolar disorder. (Tr. 273-74).

Dr. Boerger reexamined Plaintiff in June 2006. (Tr. 367-72). In his later report, he concluded that Plaintiff's ability to relate to others was moderately impaired "as a result of some low frustration tolerance and easy irritability." (Tr. 372). Her ability to understand and follow instructions was mildly to moderately impaired, and both her ability to maintain attention to perform simple, repetitive tasks and her ability to withstand the stress and pressures associated with day-to-day work activity were moderately impaired, the last being as a result of "mood swings and low frustration tolerance." (Tr. 372). Dr. Boerger's diagnosis at that time was moderate Bipolar I Disorder, most recent episode mixed. (Tr. 371). He reported that she then was working part-time. (Tr. 371, 372).

R. Kevin Goeke, Ph.D., reviewed the file on behalf of BDD in August 2003. (Tr. 275-79). Dr. Goeke concluded that Plaintiff's cognitive functioning is sufficient for non-complex tasks. (Tr. 279) He notes that during her CE ["Consultative Examination"], she related cooperatively. (*Id.*). He stated that she can concentrate on basic tasks, can drive a

vehicle, and could adapt to common changes in a familiar setting, but that "mood lability restricts work with the public to a moderate degree." (*Id.*). Her MRCF ["Mental Residual Functional Capacity Assessment"] would be limited to non-public tasks with few social demands in a setting without strict production schedules. (*Id.*). This MRCF was reviewed and approved by David W. DeMuth, M.D., on December 19, 2003. (Tr. 280)

## III. ADMINISTRATIVE REVIEW

The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See id.* A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* 20 C.F.R.§§ 404.1520(a)(4), 416.920(a)(4).[2] (Tr. 13-23). Plaintiff met the insured-status requirement for DIB

_____

[2] The remaining citations will identify the pertinent SSI Regulations with full knowledge of the corresponding DIB Regulations.

eligibility though March 31, 2004.  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  (Tr. 13, 15).  Although a dispositive finding at any Step terminates the ALJ's review, *see id.*, if fully considered, the evaluation answers five questions:

1.  Is the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

In the present case, the ALJ found at Step 1 that Plaintiff had not engaged in substantial gainful activity "at any time relevant to this decision."  (Tr. 15).  At Step 2, he found that Plaintiff has the severe impairments "bipolar disorder and [a] history of polysubstance abuse in reported remission."  (*Id.*).  The ALJ determined at Step 3 that Plaintiff does not have an impairment or a combination of impairments that meets or equals one in the Listings.  (Tr. 17).

At Step 4, the ALJ found that Plaintiff has the residual functional capacity to perform at all levels of exertion with the following nonexertional restrictions: unskilled,

simple, repetitive tasks not involving extended periods of concentration, and low-stress jobs with no production quotas, no fast-paced work, no dealing with the public, and no more than minimal and superficial contact with coworkers and supervisors, including no teamwork.  (Tr. 17).  He also concluded that Plaintiff has no past relevant work.  (Tr. 23).  Considering his other factual conclusions regarding Plaintiff, the ALJ concluded at Step 5 that "there are jobs that exist in significant numbers in the national economy" (Tr. 23), from "bakery helper" to "toy stuffer" (Tr. 24), that Plaintiff could perform.

This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB or SSI.  (Tr. 24-25).

## IV.  JUDICIAL REVIEW

Judicial review of an ALJ's decision determines whether substantial evidence in the administrative record supports the ALJ's factual findings.  *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It consists of "'more than a scintilla of evidence but less than a preponderance . . .'"  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Judicial review for substantial evidence is deferential, not *de novo*.  *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement

with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record, so long as other substantial evidence supports the ALJ's findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Still, reviewing for substantial supporting evidence is not the stopping point of judicial analysis. Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria. *See Bowen*, 478 F.3d at 746. If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's findings. *See id.* For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See Bowen*, 478 F.3d at 746 (and cases cited therein). Indeed, per *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating medical source opinions – mandates further judicial review for harmless error. *Bass v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors). Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed. *See Bass*, 499 F.3d at 512 (and cases cited therein).

*-11-*

V.    **DISCUSSION**

A.    <u>**The Parties' Contentions**</u>

Plaintiff identifies three errors allegedly committed by the ALJ.  She first

maintains that the ALJ erred by relying solely upon Dr. Boerger's final 2006 opinion to

find that Plaintiff does not meet the criteria for Social Security benefits.  Plaintiff

contends that Dr. Boerger's opinion "substantially conflicts with all of the evidence in the

record." (Doc. #6 at 14-18).   Plaintiff further argues that the ALJ erred in relying on

selected evidence to theorize that Plaintiff's behavioral issues may be related to alcohol or

drug use, rather than evaluating the record as a whole. (Doc. #6 at 18-19).  Finally, she

contends that the ALJ erred by speculating that her age (22) would allow her to maintain

full-time employment.  (Doc. #6 at 19).  Plaintiff asks the Court to vacate the ALJ's

decision for these reasons.

In response, the Commissioner argues that the ALJ applied the proper sequential

process in evaluating Plaintiff's disability claim, and that his decision is supported by

substantial evidence.  (Doc. #9 at 10).  He urges that Dr. Rahman's opinion was not

entitled to controlling or even significant weight because it was not supported by

objective medical findings and was inconsistent with other substantial record evidence,

including the opinions of Drs. Boerger, Goeke and DeMuth.  (*Id.*  at 11-17).  He also

contends that the ALJ appropriately acknowledged Plaintiff's illegal drug use, and noted

her own doctor's explanation of the effects of cannabis use.  (*Id.* at 18).  Finally, the

Commissioner asserts that consideration of Plaintiff's age was required in order for the

ALJ to properly assess her ability to perform any available jobs. He requests that the ALJ's non-disability determination be affirmed. (*Id.* at 20).

**B.     Medical Source Opinions**

Social Security Regulations require ALJs to evaluate every medical opinion of record regardless of its source. *See* 20 C.F.R. § 416.927(d). The required evaluation first focuses on treating physicians or psychologists, whose opinions are entitled to controlling weight under the treating physician rule as long as they are (1) well supported by medically acceptable data and (2) not inconsistent with other substantial evidence of record. 20 C.F.R. § 416.927(d)(2); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). When these requirements are not met, the treating physician rule does not apply. *Id.*

Once the ALJ has concluded that the treating physician rule does not apply to a particular treating source's opinion, the evaluation has only just begun. The ALJ must continue to evaluate the treating source's opinion by considering the following additional factors:

1.     The length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship;

2.     The 'supportability' of the opinion – whether it is supported with relevant evidence and whether it is well explained;

3.     The consistency of the opinion with the record as a whole;

4.     The specialization, if any, of the treating source; and

5.     'Other factors' brought to the ALJ's attention, including, for example, the

treating source's knowledge of the SSI or DIB programs and its evidentiary requirements.

20 C.F.R. § 416.927(d)(2)-(6); *see Wilson*, 378 F.3d at 544.

As to non-treating medical sources – such as one-time examiners or medical experts who testify during the administrative hearing – ALJs must evaluate their opinions under the same factors applicable to treating medical sources, *i.e.,* supportability, consistency, specialization, etc. *See* 20 C.F.R. § 416.927(d), (f). The Regulations appear to emphasize this requirement by reiterating it no fewer than three times. *See* 20 C.F.R. § 416.927(d) ("we consider all of the following factors in deciding the weight to give any medical opinion . . ."); *see* also 20 C.F.R. § 416.927(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. § 416.927(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (S.S.A. July 2, 1996) (same).

Failure to consider the record as a whole undermines the Commissioner's conclusion. *Hurst v. Sec'y of Health & Human Servs.,* 753 F.2d 517, 518 (6th Cir. 1985) (citing *Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980)). The Court there stated:

> In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation. It is more than merely "helpful" for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review.

*Hurst*, 753 F.2d at 519 (citation omitted).

C.    **Analysis**

In discussing the medical opinion evidence, the ALJ expressly referred to both the legal standards applicable under the treating physician rule (without calling it such), and to the additional regulatory factors that apply to treating physicians and other medical sources.  (*See* Tr. 17).  He then proceeded to analyze Dr. Boerger's and Dr. Rahman's opinions in accordance with those factors.

In declining to give Dr. Rahman's opinion controlling weight, the ALJ specifically notes that Dr. Rahman's narrative report to Plaintiff's attorney cited "panic disorder" as one of Plaintiff's impairments, despite the absence of any reference to panic disorder anywhere in his treatment notes or in prior treatment records.  (Tr. 19).  He also observes that Dr. Rahman's professed ignorance of any drug or alcohol history relative to Plaintiff is inconsistent with documentation in other treating source records of Plaintiff's past marijuana use and alcohol abuse (*id.*), and that Dr. Rahman also made no mention of Plaintiff's attempted burglary conviction and incarceration.  The ALJ notes that Dr. Rahman's primary role in treating Plaintiff was to monitor her medication.[3]  (Tr. 19, 20).  He also comments on the "minimal," "sketchy" and "cursory" nature of Dr. Rahman's medical records and treatment.  (Tr. 19-20).

Nevertheless, the ALJ affirmatively states that Dr. Rahman's assessments were "considered in finding the multiple limitations of a nonexertional nature" regarding

---

[3]This conclusion is confirmed by Plaintiff's own hearing testimony.  (*See* Tr. 406-07 [testifying that Dr. Rahman prescribes her current medications and that she currently gets no counseling]; Tr. 400 [answering "No" when asked whether she had therapy sessions at Dr. Rahman's office]).

Plaintiff's residual functional capacity.  (Tr. 20).  A comparison of those limitations (*see*

Tr. 17) to Dr. Rahman's statements regarding Plaintiff's work-related abilities (*see* Tr.

376) suggests that the limitations set by the ALJ indeed were influenced by Dr. Rahman's

views.  Having conducted an appropriate evaluation of Dr. Rahman's opinion, having

reasonably inferred from the evidence "that [Dr. Rahman] really does not appear to be all

that knowledgeable about the patient or her history," and having concluded that Dr.

Rahman' opinion was neither "well support[ed]" nor consistent with the record as a

whole (Tr. 20), however, the ALJ was not required to adopt wholly Dr. Rahman's stated

belief that Plaintiff "can[not] be gainfully employed" due to her bipolar disorder.  (*See* Tr.

376).  A medical source's statement that a claimant is "unable to work" is an opinion on

an issue reserved to the Commissioner, and is not entitled to controlling weight.  *See* 20

C.F.R. §§ 404.1527(e), 416.927(e).   Because the ALJ nonetheless considered that

opinion subject to the applicable regulatory factors, and also explained his reasons for not

adopting that opinion, he did not err as a matter of law.  *See Bass v. McMahon*, 499 F.3d

506, 511 (6th Cir. 2007).

　　　　Contrary to Plaintiff's assertions (*see* Doc. #6 at 14), a review of the record as a

whole also does not support a conclusion that the ALJ erred in relying on Dr. Boerger's

opinion, or in discounting Dr. Rahman's opinion.  In contrast to Dr. Rahman, Dr. Boerger

conducted a detailed assessment of Plaintiff's daily activities and related the results of

mental status tests he administered (measuring cognitive functioning, memory recall and

mathematical aptitude).  (*See* Tr. 269-74, 367-74).  Dr. Boerger's conclusions were

substantially consistent with other medical evidence of record, while evidence regarding Plaintiff's other treating psychiatrists reflects inconsistencies with information provided by Dr. Rahman.  Records relating to the time period during which she was being treated by Dr. Jamie Snyder suggest that Plaintiff experienced the worst of her symptoms, including hospitalization, while under Dr. Snyder's care.  (*See* Tr. 217-26, 229-32, 246-53).  Her condition at that time also was complicated by marijuana use, "up to 3 to 4 bowls a day for the past 3 years," according to hospital records.  (*See* Tr. 217, 218).  "It was described to her that regular use of the cannabis could destabilize her moods and lead to more depressive symptoms," and "[i]t was recommended that [she] receive some chemical dependency counseling."  (Tr. 219).  By letter dated April 15, 2002, Dr. Snyder stated that Plaintiff's bipolar disorder "is treatable with medications," and that Plaintiff's "mood was stable on medications."  (Tr. 260).  From May 2002 to May 2003, Plaintiff also treated with Mahendra K. Mahajan, M.D., whose records reflect Plaintiff "doing well" for the most part.  (*See* Tr. 255, 258, 259).  Accordingly, the Court finds no error attributable to the ALJ's alleged reliance "on only bits and pieces of the records" rather than the record as a whole.  (Doc. #6 at 15).

As to Plaintiff's second allegation of error (Doc. #6 at 18-19), the Court finds no support for Plaintiff's contention that the ALJ erred by "blam[ing] [Plaintiff's] behavioral changes on substance abuse."  (Doc. #6 at 18).  By finding that Plaintiff's "severe" impairments included a "history of polysubstance abuse in reported remission" (Tr. 15), the ALJ both acknowledged that Plaintiff's past drug and alcohol use was a legitimate

additional factor to consider in determining whether Plaintiff's ability to work was even more restricted than by her bipolar disorder alone, and credited Plaintiff's own testimony that she no longer is abusing drugs or alcohol. (*See* Tr. 402). Neither finding negatively impacted the outcome on Plaintiff's application. The ALJ's further mention of Plaintiff's past drug and alcohol use when highlighting Dr. Rahman's failure to acknowledge Plaintiff's history of such was offered in the context of assessing the completeness and credibility of Dr. Rahman's records and opinions, with no suggestion of "blame." (*See* Tr. 19, 20 ["His omissions related to her substance abuse history . . . support that he really does not appear to be all that knowledgeable about the patient or her history."]).

To the extent that the ALJ does discuss Plaintiff's past substance abuse as possibly affecting her condition, however, his assessment of its significance actually led him to recognize a more restrictive assessment of Plaintiff's work-related abilities (*see* Tr. 22 ["Due to the mood disorder **and history of polysubstance abuse**, I have limited the claimant to low stress jobs as described in the residual functional capacity" (emphasis added)]), a conclusion favorable to Plaintiff. Evidence from Plaintiff's own medical records also supports an inference that Plaintiff's condition could be exacerbated by drug and alcohol use. (*See* Tr. 219 ["regular use of the cannabis could destabilize her moods and lead to more depressive symptoms"]). It therefore was not error for the ALJ to remark that "the claimant's behavior might be substantially improved because she must avoid any type of substance abuse [while] on parole." (Tr. 19).

In her final claim of error, Plaintiff complains that the ALJ "makes comments in

*-18-*

his opinion regarding the claimant's age and does not seem to understand why someone so young could not maintain full[-]time employment."  (Doc. #6 at 19).  The ALJ's purportedly objectionable remarks to that effect were as follows:

> She is currently only twenty[-]two years old and most of the difficulties adjusting to the workplace were as a teen, so for one so young this cannot be taken to indicate inability to ever be able to perform full-time work.  She never appears to have any difficulty obtaining a job (such as in the fast food industry) so prospective employers must feel the same way.

(Tr. 21).  Plaintiff cites no authority for the proposition that such comments constitute error, arguing only that because her jobs all have been in the fast food industry, where there is "no extensive interview process" and where Plaintiff never has completed the standard 90 day probationary period before being terminated, Plaintiff's work record actually shows "that the employers do not feel [Plaintiff] is able to maintain full[-]time employment with them."  (Tr. 19).

As the Commissioner aptly notes, the ALJ was required to take Plaintiff's age into account in the process of assessing whether she was disabled for Social Security purposes (Doc. #9 at 19), and her relative youth is a relevant factor in that analysis.  *See, e.g.,* 20 C.F.R. §§ 404.1563(c), 416.963(c).  The ALJ properly based his assessment on the vocational expert's testimony regarding jobs available in the regional and national economies for someone of Plaintiff's age, sharing her other relevant characteristics.  (Tr. 411-12).  *See Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777 (6th Cir. 1987). There is no indication that the ALJ's extraneous observations regarding Plaintiff's teenaged difficulties in the workplace and seeming ease in finding jobs affected the

disposition of her application, and they certainly do not constitute error.  Plaintiff's

argument in this final respect thus lacks merit.

The Court's duty on appeal is not to reweigh the evidence, but to determine

whether the decision below is supported by substantial evidence.  *See Raisor v.*

*Schweiker,* 540 F.Supp. 686 (S.D. Ohio 1982) (Spiegel, J.).  The medical evidence of

record regarding Plaintiff's condition is sufficient to support the ALJ's conclusion that no

disabling condition is present. Therefore, the Court finds that substantial evidence

supports the ALJ's decision that Plaintiff was not disabled.

Accordingly, for all the above reasons, Plaintiff's Statement of Issues lacks merit.


## IT THEREFORE IS RECOMMENDED THAT:

1.     The Commissioner's final non-disability determination is affirmed; and

2.     The case is terminated on the docket of this Court.


August 14, 2008                                       s/ Sharon L. Ovington
                                                      Sharon L. Ovington
                                                 United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).